UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLORIANNA CERVANTES,                          Case No. 08-14390

                    Plaintiff,                HONORABLE SEAN F. COX
                                              United States District Judge
v.

KORY TORBETT and SAM PHILIPP,

                    Defendants.
_____/

OPINION & ORDER DENYING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [Doc. No. 10]

        Plaintiff Glorianna Cervantes ("Cervantes") filed this § 1983 action, with pendant state

law claims, on or about August 19, 2008 in Michigan state court.  Defendants Kory Torbett

("Torbett") and Sam Philipp ("Philipp") (collectively, "the Defendants") removed this action on

October 15, 2008.  The matter is before the Court on the Defendants' motion for summary

judgment [Doc. No. 10], in which the Defendants seek 1) outright dismissal; or in the alternative

2) qualified immunity from Ms. Cervantes' claims.  The parties have fully briefed the issues, and

a hearing was held February 18, 2010.  For the reasons below, the Court **DENIES** the

Defendants' motion [Doc. No. 10].

BACKGROUND

        Many of the facts in this case are disputed by the parties - and many of the Defendants'

arguments in support of their motion for summary judgment are based upon their version of the

facts.  Consistent with FED. R. CIV. P. 56(c), the following are the relevant facts of the instant

case, viewed in the light most favorable to Ms. Cervantes.

1

On July 11, 2007, at approximately 2:20 a.m., Officers Torbett and Philipp of the Blackmun Township, Michigan, Public Safety Department were dispatched to an apartment complex at 1512 Gallery Place Drive. [Torbett Dep., Def.'s Ex. 1, Doc. No. 10; Philipp Dep., Def.'s Ex. 10, Doc. No. 10].  Dispatch advised the officers that there was "a domestic assault occurring in a yellow Mustang" between a male and a female.  [Torbett Dep. at pp.5-7].

While the officers now argue that they did not know which of the Mustang's passengers was the victim and which was the assailant when they arrived on the scene [*See* Def.'s Br., Doc. No. 10, p.11], this position is belied by Officer Torbett's deposition testimony:

Q:    What do you recall being told by the dispatcher when you were initially given this call?
A:    That there was a yellow Mustang going through the parking lot at Gallery Place [apartment complex] in the area of the address where we initially looked for the subjects.  Stated that the car was all over the parking lot hitting curbs, and that *the male suspect was striking the female suspect*.

[Torbett Dep., Def.'s Ex. 1, Doc. No. 10, p.59].

Upon arriving at the apartment complex on July 11, 2007, the officers located the yellow Mustang, but were unable to locate the individuals involved.  However, after a few minutes, the officers saw a female - Ms. Cervantes - walk from an apartment building toward the Mustang, retrieve her purse from the vehicle, and then walk back inside.  *Id*. at 5.  The officers then followed Ms. Cervantes into the apartment complex.

Upon entering the common area of the apartment complex, the officers found Ms. Cervantes in the hallway, intoxicated, with blood coming from her nose.  *Id*. at 50.  The officers' interaction with Ms. Cervantes was captured on their on-person microphones.  *See id*. at pp.49-55.  Officer Torbett asked Ms. Cervantes what had occurred, to which Ms. Cervantes simply stated that "nothing happened."  *Id*. at p.50.

Both officers then demanded that Ms. Cervantes tell them which apartment she lived in and demanded that she show them identification, to which Ms. Cervantes told them she did not have identification and to leave her alone. Ms. Cervantes was irate and yelling at the officers throughout most of their interaction. *Id*. at pp.50-54.

Ms. Cervantes attempted to leave the common area of the apartment complex several times, which Officer Philipp stated led him to grab Ms. Cervantes by her arm and say "[i]f you try to walk by me again. . . ." *Id*. at 51. At this, Ms. Cervantes again told the officer to stop grabbing her by her arm, to which Officer Phillip responded "stop yelling at me." *Id*. Ms. Cervantes then told the officers to get away from her, to which Officer Phillip responded by saying "[d]on't make me put you in custody." *Id*. Ms. Cervantes then said "excuse me" as she tried again to exit the apartment's common area, and Officer Philipp repeated his threat to put her in custody, and that Ms. Cervantes was not free to leave. *Id*.

Ms. Cervantes then asked the officers again to move out of her way. Officer Phillip responded by saying "Ma'am, no I can't," and Officer Torbett again demanded her identification. *Id*. When Ms. Cervantes told the officers she did not have any ID - which was a lie - Officer Torbett demanded that Ms. Cervantes get her identification from her purse. *Id*. at 52. At this, Ms. Cervantes again asked the officers to step back, to which Officer Philipp again told Ms. Cervantes that she was not going anywhere, and grabbed her by the arm. Ms. Cervantes asked "You're putting your hands on me again?[,]" to which Officer Philipp responded, "You're right, I am. Now knock it off. You want to go to jail?" *Id*. When Ms. Cervantes replied "I don't need to go to jail," Officer Philipp again demanded for her to hand over her purse. Ms. Cervantes replied "No. You're not getting my purse. Are you kidding me?" *Id*. at 52-53.

Ms. Cervantes then tried again to get away from the officers, prompting Officer Philipp to again grab Ms. Cervantes by her arm. At this, Ms. Cervantes admits she made physical contact with Officer Philipp. In the words of Officer Torbett, "Plaintiff used her other hand and attempted to slide [Officer] Philipp's hand off of her arm." [Torbett Dep., Def.'s Ex. 1, Doc. No. 10, p.53]. Ms. Cervantes also pushed Officer Philipp "in the upper left arm/shoulder area," in an attempt to "get by" him. *Id.* In response, Officer Torbett advised Ms. Cervantes that she was under arrest for assaulting a police officer. *Id.*

Ms. Cervantes resisted attempts to handcuff her, which at some point - it is not clear from the deposition testimony, or from the officers' on-person microphones - resulted in the two officers securing Ms. Cervantes on the ground facing the floor. Ms. Cervantes - a 5'2", 135-pound female - was therefore being held on the ground by two male police officers. Deposition testimony further shows that Officer Philipp was a 5'9", 230-pound male, and Officer Torbett was a 5'11", 193-pound male.

At this point - after the officers already had Ms. Cervantes secured on the ground - Ms. Cervantes still would not let go of her purse, which Officer Torbett testified was preventing them from handcuffing her. *Id.* at 54. In light of this, and in response to Ms. Cervantes admitting that she was "kicking them to try and get away," [Cervantes Dep., Def.'s Ex. 3, Doc. No. 10, p.77] Officer Philipp made what the Defendants characterize as a "split-second decision" [*See* Def.'s Br., Doc. No. 10, p.6] to deploy his pepper spray in an effort to subdue Ms. Cervantes:

Q:      . . . Where were you, when you used the chemical agent?
A:      Right next to her.
Q:      On the tile or on the carpet?
A:      I was on the tile on my knees.
Q:      And where was Officer Torbet[t]?
A:      I think he was on the carpet behind her or to the side of her. She was

                    facedown.
Q:      Okay. Was she sitting? Prone?
A:      Prone.

[Philipp Dep., Def.'s Ex. 2, Doc. No. 10, p.39]. The blast of pepper spray was to Ms. Cervantes' eyes and nose - the later of which the Defendants knew had blood on it, suggesting an open wound - and lasted "[one] second or less." *Id.* After the pepper spray was administered, Officer Philipp - though he vehemently denies saying as much - can clearly be heard on the audio calling Ms. Cervantes a "tramp." *Id.* at 54.

     The Blackmun Township police department has a written policy regarding the use of force [*See* Use of Force Policy, Def.'s Ex. 6, Doc. No. 10.]. This policy requires the use of empty hand techniques *and/or verbal commands* before a suspect is pepper sprayed. Further, officers are not to utilize pepper spray on an area of the suspect containing open wounds. Finally, *immediately after its use*, officers are required to notify a supervisor and *to begin decontamination*. The officers admitted at their depositions that they were each familiar with the Use of Force Policy.

     After she was pepper sprayed, the officers were able to complete the handcuffing of Ms. Cervantes. [Torbett Dep., Def.'s Ex. 1, Doc. No. 10, p.55]. However, instead of immediately calling their supervisors and beginning decontamination procedures, as instructed by the Use of Force Policy, the officers instead placed Ms. Cervantes into the back of a patrol car *and left her there while they returned to the apartment complex to continue their investigation. Id.* "While in the back of the police car, Plaintiff can be heard screaming, crying and yelling at the officers, threatening a lawsuit, and uttering numerous profanities." [Def.'s Br., Doc. No. 10, p.6]. Ms. Cervantes was also pleading with the officers to decontaminate her eyes.

Instead of adhering to the Use of Force Policy's requirement to immediately begin decontamination procedures, the officers instead returned inside the apartment complex and made contact with Ms. Cervantes' boyfriend, Scott Pressler. Ultimately, after speaking with Mr. Pressler - who was also intoxicated - the officers arrested him on domestic violence charges. It was only after the officers completed their investigation of Mr. Pressler - *twenty three minutes later* - that the officers radioed for an ambulance to decontaminate Ms. Cervantes' eyes and nose. *Id*. at 62. After a few hours, both Ms. Cervantes and Mr. Pressler posted bond and were released from custody, though the prosecutor never issued charges against either of them.

Ms. Cervantes filed this action on or about August 19, 2008 in Michigan state court, alleging violations of her fourth amendment rights to be free from false arrest and from excessive force, and a state law claim for assault and battery. The Defendants removed this action on October 15, 2008. Following the close of discovery, the Defendants filed this motion, in which they seek dismissal of all charges against them. In the alternative the Defendants argue that they are entitled to qualified immunity on Ms. Cervantes' federal claims, and governmental immunity on Ms. Cervantes' state law claim.

### STANDARD OF REVIEW

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgement as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the

affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting FED. R. CIV. P. 56(e)).

ANALYSIS

The Defendants seek summary judgment on Ms. Cervantes' causes of action, or, in the alternative, qualified immunity. For the reasons that follow, the Court **DENIES** their motion for summary judgment [Doc. No. 10].

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

In assessing qualified immunity inquiries, federal courts, viewing the facts in the light most favorable to the plaintiff, evaluate: 1) whether the violation of a constitutional right has occurred; and 2) whether the constitutional right at issue "was clearly established at the time of the defendant's alleged misconduct." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Supreme Court, in *Pierson v. Callahan*, 129 S.Ct. 808, 818 (2009), recently granted courts the discretion to conduct this two-step analysis in the manner most appropriate to the case before them. *See also Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009). Despite *Pierson*, however, this Court will begin with the traditional inquiry into whether the violation of a constitutional right occurred before inquiring whether such rights were clearly established.

I. <u>Ms. Cervantes' Excessive Force Allegations</u>.

In Count III of her Complaint, Ms. Cervantes alleges that Officers Torbett and Philipp used excessive force in violation of the Fourth Amendment when they pepper sprayed her. The Defendants argue that their use of pepper spray was objectively reasonable, and in the alternative, argue that the nature of any such Fourth Amendment violation was not "clearly established" at the time of their encounter with Mr. Cervantes. The Court disagrees.

The first inquiry in a qualified immunity analysis is whether a constitutional violation has occurred. *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008). In determining whether an excessive force constitutional violation occurred, the Sixth Circuit counsels this Court to "look at the objective reasonableness of the defendant's conduct, which depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer at the scene and not with 20/20 hindsight." *Grawey*, 567 F.3d at 310 (internal citations and quotations omitted).

Among the factors to consider in determining the reasonableness of force used are: 1) the severity of the crime at issue; 2) whether the suspect posed an immediate threat to the safety of the police officer or others; and 3) whether the suspect actively resisted arrest or attempted to evade arrest by flight. *Id.*, citing *Graham v. Connor*, 490 U.S. 386, 396 (1989).

The Sixth Circuit has considered several excessive force claims involving the use of pepper spray by police officers. The use of pepper spray on a handcuffed and hobbled person has been clearly established as excessive force. *See Champion v. Outlook Nashville*, 380 F.3d 893, 903 (6th Cir. 2004). The use of pepper spray is also considered excessive where a detainee has surrendered, is secured, is not acting violently, and does not pose a threat to officers or third parties. *Cabaniss v. City of Riverside*, 231 Fed. Appx. 407, 413 (6th Cir. 2007). Officers also use excessive force where they pepper spray a suspect who has not been told they are under

arrest and is not resisting. *Atkins v. Twp. of Flint*, 94 Fed. Appx. 342, 349 (6th Cir. 2004).

In *Grawey v. Drury*, 567 F.3d 302, 306 (6th Cir. 2009), the plaintiff - an intoxicated male - was ejected from a bar after he got into an altercation with another patron and his head was smashed into a table. During a conversation with police officers outside, in which Grawey told them that he had just been attacked, Grawey "repeatedly reached for his injured head. Each time Grawey reached for his head, [the officer] interrupted him and told him to put his hands down. This agitated Grawey, to the point that he turned and walked away from the officer - at which point the officer discharged his pepper spray at Grawey." *Id*. Grawey ran toward his mother's house with the officer chasing him, then stopped and put his hands on a building and waited for the officer to catch up to him. *Id*. at 306-07. Despite other witnesses on the scene stating that Grawey was not resisting, and despite Grawey never being told he was under arrest, the officer again pepper sprayed Grawey when he caught up to him. *Id*. at 307.

The Sixth Circuit in *Grawey* affirmed the district court's denial of qualified immunity for the officer, finding that the *Graham* factors weighed in favor of the plaintiff:

> Moreover, applying the three *Graham* factors - severity of the crime, immediate threat to officers or others, and actively resisting arrest or trying to flee - [the officer's] conduct was not objectively reasonable when the facts are viewed in the light most favorable to Grawey. Grawey's crime, disturbing the peace, was relatively minor. Grawey, who was unarmed, did not pose an immediate threat to the officers or to others when [the officer] sprayed him. And Grawey was not actively resisting arrest or trying to flee at the time he was pepper sprayed by [the officer].

*Id*. at 311.

Taken in totality, the Sixth Circuit's holdings demonstrate several common themes regarding claims of excessive force involving pepper spray. Qualified immunity is denied where

the defendant is not actively resisting arrest or has surrendered, *Cabaniss*, 231 Fed. Appx. at 413; *Adams v. Metiva*, 31 F.3d 375, 378 (6th Cir. 1994), or where the suspect claims that the police started the altercation. *Atkins*, 94 Fed. Appx. at 349. Qualified immunity is also denied where the suspect is sprayed before being informed that he or she is under arrest. *Atkins* at 349; *Grawey*, 567 F.3d at 307. Disobeying a lawful command to stop can still generate fact questions on excessive force claims. *Grawey* at 306, *Adams* at 378. Failure to follow internal regulations regarding the use of pepper spray can also generate fact questions. *Grawey* at 313. Even in cases where the suspect has a size advantage on the officers - as in *Greene v. Barber*, 310 F.3d 889 (6th Cir. 2002), where the suspect was a verbally abusive, three-hundred pound male - fact questions can still warrant the denial of qualified immunity. *Greene*, 310 F.3d at 898.

In the instant case, taking the facts in the light most favorable to Ms. Cervantes as required by FED. R. CIV. P. 56(c), Officers Torbett and Phillip entered the common area of the apartment complex, and found Ms. Cervantes - visibly intoxicated, and according to the officers, apparently bleeding from the nose. When they asked Ms. Cervantes what had happened and for her to produce identification, Ms. Cervantes told the officers to leave her alone, and tried to walk away. Officer Philipp grabbed Ms. Cervantes' arm to prevent her from leaving, at which point Ms. Cervantes tried to push his hand off of her arm. When Ms. Cervantes told the officer to stop touching her, Officer Philipp then threatened to put Ms. Cervantes in custody. When she continued to refuse to supply the officers with identification, the officers attempted to turn Ms. Cervantes around and arrest her - which Ms. Cervantes freely admits she physically resisted. During the struggle to handcuff Ms. Cervantes, *after the officers already had her on the ground*, Ms. Cervantes was pepper sprayed.

After getting handcuffs on Ms. Cervantes, the officers escorted her to one of their patrol vehicles. Ms. Cervantes was left inside the patrol car while the Officers went back inside to continue their domestic assault investigation, ultimately taking Ms. Cervantes' boyfriend into custody as well. Ms. Cervantes can clearly be heard on the in-car audio recording pleading for water to rinse her eyes out from the pepper spray. It was only when the officers completed their domestic violence investigation - twenty three minutes later - that they radioed for an ambulance to decontaminate Ms. Cervantes' eyes.

On these facts, the Court finds genuine issues of material fact remain regarding Ms. Cervantes' excessive force claim. The *Graham* factors weigh in favor of such a holding. Regarding the "severity of the crime," Ms. Cervantes is alleged to have hindered and obstructed a police investigation - a crime less severe than the disorderly conduct charge also found excusable in *Grawey* - and assaulting a police officer - which, under Ms. Cervantes' version of the facts, did not even occur. Regarding the "threat to officers and others" prong, Ms. Cervantes, like the plaintiff in *Grawey*, was unarmed and intoxicated - and Ms. Cervantes was clearly overmatched physically by Officers Torbett and Philipp. Finally, under the "resisting or fleeing" prong, while Ms. Cervantes admits she was trying to leave, she claims she was not physically resisting the officers before they assaulted her. The *Graham* factors thus weigh in favor of Ms. Cervantes.

The Sixth Circuit's holding in *Greene* is instructive. There, a verbally abusive, *three hundred pound male*, who *actively resisted officer attempts to restrain him*, still generated fact questions about the excessive nature of the pepper spray used on him. *Greene*, 310 F.3d at 898. If anything, the suspect in *Greene* was *more* of a threat to officer safety than was Ms. Cervantes.

*Atkins* is also instructive: like Ms. Cervantes, though the plaintiff in *Atkins* was charged with assaulting an officer, his version of events - that the officers started the altercation, and that he was merely defending himself - was sufficient to survive summary judgment on qualified immunity grounds. *Atkins*, 94 Fed. Appx. at 349.

The officers freely concede that Ms. Cervantes had blood on her face, which appeared to be coming from her nose. Indeed, *this was one of the facts the officers relied upon* in identifying Ms. Cervantes as the possible female involved in the domestic dispute. Under the Use of Force Policy [Def.'s Ex. 6, Doc. No. 10] officers are required to notify a supervisor, and *begin decontamination, immediately after using pepper spray*. At deposition, Officer Torbett also acknowledged that officers were not to use pepper spray on an area *with open wounds*.[1] Here, Ms. Cervantes alleges that the officers used pepper spray on her before utilizing other, "open hand" techniques, that they sprayed her face which contained an open wound, and that the officers waited *twenty-three minutes* before calling for an ambulance to decontaminate her eyes. As in *Grawey*, 567 F.3d at 513, these potential violations of internal policy generate fact issues regarding the potentially excessive force used on Ms. Cervantes.

Further, the excessive force cases discussed *supra* also hold that the nature of conduct similar to that alleged by Ms. Cervantes was "clearly established" as a Fourth Amendment violation at the time of the incident. The key determination is whether a defendant moving for summary judgment on qualified immunity grounds was on notice that his alleged actions were

---

[1] Though the officers dispute *knowing* that the blood on Ms. Cervantes' face was from an open wound on her face, a jury could certainly find that a reasonable officer on the scene of a domestic violence call, confronted with a female who potentially could be the *victim* of the crime they were sent to investigate, would inquire further into the blood on that person's face *which appeared to be coming from her nose*, before using pepper spray on that individual.

unconstitutional. *Lyons v. City of Xenia*, 417 F.3d 565, 579 (6th Cir. 2005).

"[A]n action's unlawfulness can be apparent from direct holdings, from specific examples of conduct described as prohibited, or from the general reasoning that a court employs." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003). "In an obvious case, general standards can clearly establish the answer, even without a body of relevant case law." *Sample v. Bailey*, 409 F.3d 689, 699 (6th Cir. 2005). "[T]here need not even be a case with the exact same fact pattern or even fundamentally similar or materially similar facts; rather, the question is whether the defendants had fair warning that their actions were unconstitutional." *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005) (internal quotations omitted). Thus, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

In *Grawey*, the Sixth Circuit held that "the general consensus among our cases is that officers cannot use force, including pepper spray, on a detainee who has been subdued, is not told he is under arrest, or is not resisting arrest." *Grawey*, 567 F.3d at 314. "[A] reasonable officer would know that using pepper spray on a suspect who has submitted, is not resisting, and is no danger to anyone constitutes excessive force." *Id*.

Though the Defendants here obviously were not aware of *Grawey* in July of 2007 - *Grawey*, after all, was not decided until 2009 - the Sixth Circuit's holdings in *Atkins*, *Greene* and *Adams* demonstrate that the nature of the officer's alleged actions as violating Ms. Cervantes' right against excessive force was "clearly established" on July 11, 2007. For these reasons, the Court **DENIES** summary judgment on Ms. Cervantes' excessive force claims.

II. <u>Ms. Cervantes' False Arrest Allegations.</u>

In Count I of her Complaint, Ms. Cervantes alleges that Officers Torbett and Philipp violated her Fourth Amendment protection against unreasonable seizures when they prevented her from leaving the common area of her apartment building. Further, Count II of Ms. Cervantes' Complaint alleges that the officers violated her Fourth Amendment protection against false arrest when they arrested her without probable cause. The Defendants argue that their initial detention of Ms. Cervantes was constitutional under *Terry v. Ohio*, 392 U.S. 1 (1968), and that their arrest of Ms. Cervantes was based upon probable cause. In the alternative, the officers argue that the nature of any such Fourth Amendment violation was not "clearly established" at the time of their encounter with Ms. Cervantes. The Court disagrees.

A. Ms. Cervantes' Unreasonable Seizure Claims.

In their brief, the Defendants argue that they were justified, pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), in initially detaining Ms. Cervantes:

> Here, the Officers had been advised by dispatch that a male and female had been involved in a potential physical domestic situation in a yellow Mustang located within the apartment complex. However, *they did not know which of the individuals was the instigator and which was the victim*. In addition, even assuming they suspected Plaintiff to be the victim, the [department's domestic violence] policy required them to interview her so that they could complete not only their criminal investigation into the domestic violence complaint, but also to ensure that she was not in need of medical attention.

[Def.'s Br., Doc. No. 10, p.11 (emphasis added)]. Therefore, the Defendants argue that their initial detention of Ms. Cervantes was warranted under *Terry v. Ohio.*

The officer's purported lack of information regarding whether Ms. Cervantes was the *victim* or the *assailant*, however, is belied by Officer Torbett's deposition testimony:

> Q:   What do you recall being told by the dispatcher when you were initially given this call?
> A:   That there was a yellow Mustang going through the parking lot at Gallery

14

> Place [apartment complex] in the area of the address where we initially
> looked for the subjects. Stated that the car was all over the parking lot
> hitting curbs, and that *the male suspect was striking the female suspect*.

[Torbett Dep., Def.'s Ex. 1, Doc. No. 10, p.59 (emphasis added)].  While the officers *now* argue

that they did not know whether Ms. Cervantes was the victim or the assailant, that position is not

supported by the record, taken in the light most favorable to Ms. Cervantes.  For purposes of this

motion, therefore, the Court assumes that the officers knew Ms. Cervantes - as the female

thought to be connected with the 911 dispatch - was the suspected *victim* of the disturbance they

were called upon to investigate.

The U.S. Supreme Court has held that, in general:

> law enforcement officers do not violate the Fourth Amendment by merely
> approaching an individual on the street or in another public place, by asking him
> if he is willing to answer some questions, by putting questions to him *if the
> person is willing to listen*, or by offering in evidence in a criminal prosecution his
> voluntary answers to such questions.

*Florida v. Royer*, 460 U.S. 491, 497 (emphasis added).  "The person approached, however, *need

not answer any question put to him; indeed, he may decline to listen to questions at all and go on

his way*."  *Id*., quoting *Terry v. Ohio*, 392 U.S. at 32-33 (emphasis added).

The Supreme Court's holding in *Terry v. Ohio* "created a limited exception to this

general rule." *Royer*, 460 U.S. at 498.  Pursuant to *Terry*, "certain seizures are justifiable under

the Fourth Amendment if there is articulable suspicion *that a person has committed or is about

to commit a crime*."  *Id*. (emphasis added).

Thus, pursuant to *Royer*, Officers Torbett and Philipp were free to approach Ms.

Cervantes and ask questions of her without violating her Fourth Amendment rights.  Given the

Blackmun Township Police Department's domestic violence policy, the officers were likely

*required* to look into Ms. Cervantes' condition. Under *Royer*, however, Ms. Cervantes was free to ignore the officers' questions and "to go on h[er] way," *Id*. at 497, if she so chose. That the police department's domestic violence policy states that on-scene investigations "*will* include interviewing witnesses and collecting evidence of all possible crimes committed" [Def.'s Ex. 5, Doc. No. 10, p.9] is irrelevant - the Blackmun Township Police Department's furtherance of the public good can not take precedence over the Fourth Amendment.

Again, *Terry*'s allowance for police officers to engage in a brief, investigatory detentions is limited to individuals for whom the officer has reasonable suspicion "has committed or is about to commit a crime." *Royer*, 460 U.S. at 498. As explained *supra*, in the light most favorable to Ms. Cervantes, the officers could not have suspected Ms. Cervantes committed the domestic assault they were called upon to investigate - they knew from the 911 dispatch that *the assailant was a male*. The Defendants have provided the Court with no case law which supports the right of the police to engage in *Terry* stops of suspected *victims*.

The Defendants concede that Ms. Cervantes was "seized" for purposes of the Fourth Amendment during their purported *Terry* investigatory detention. As outlined in *Royer*, the officers did not have reasonable suspicion that Ms. Cervantes committed a crime at the time they seized her. Therefore, Ms. Cervantes has sufficiently alleged a violation of her Fourth Amendment right to be free from unreasonable seizure.

Under the second prong of the qualified immunity analysis, Ms. Cervantes has alleged a Fourth Amendment "unreasonable seizure" violation which was clearly established. *Royer*, decided in 1983, makes clear that the right of the police to engage in *Terry* stops is limited to situations where the police have "articulable suspicion that [the] person has committed or is

about to commit a crime." *Royer*, 460 U.S. 491. The Defendants' arguments to the contrary are without merit.

### B. Ms. Cervantes' False Arrest Claims.

Ms. Cervantes has also sufficiently alleged a "clearly established" violation of her Fourth Amendment right to be free from arrest without probable cause. For a false arrest claim to succeed under § 1983, a plaintiff must prove that the police lacked probable cause to arrest. *Fridley v. Hughes*, 291 F.3d 867, 872 (6th Cir. 2002). Probable cause is defined as a "fair probability that the individual to be arrested has either committed or intends to commit a crime." *Id*. Put another way, probable cause exists where reasonably trustworthy facts and circumstances known to the police officer were sufficient for a prudent man to believe the arrestee had committed or was committing an offense. *Diamond v. Howe*, 288 F.3d 932, 936 (6th Cir. 2002). Courts assess an officer's determination of probable cause from the perspective of a reasonable officer at the scene, rather than with the benefit of hindsight reflection. *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001).

The Defendants argue that, from her interactions with them on July 11, 2007, they had probable cause to arrest Ms. Cervantes for violation of two Michigan statutes. The first statute, assault and battery, states as follows:

> Except as otherwise provided in this section, a person who assaults or assaults and batters an individual, if no other punishment is prescribed by law, is guilty of a misdemeanor punishable by imprisonment for not more than 93 days or a fine of not more than $500.00, or both.

M.C.L. § 750.81(1).

The officers argue that Ms. Cervantes "made physical contact" with Officer Philipp in order to "push his hand off" of her, and that this constituted a battery upon Officer Philipp. [*See*

17

Def.'s Br., Doc. No. 10, p.14].  The Defendants also argue that Ms. Cervantes "physically hit Officer Torbet[t] in the chest," though their citation to Ms. Cervantes's deposition does not support this allegation. [*Id.*, citing Cervantes Dep., Def.'s Ex. 3, pp.55-56, 65].

Again, however, for purposes of this motion the Court must construe all fact questions in the light most favorable to Ms. Cervantes, who denies striking or attempting to strike either officer. [*See* Cervantes Affidavit, Pl.'s Ex. 3, Doc. No. 14].  Rather, Ms. Cervantes alleges that the officers assaulted *her*, and that she only defended herself from their attacks.

Michigan law permits an individual not engaged in the commission of a crime to use non-deadly force in self defense:

> An individual who has not or is not engaged in the commission of a crime at the time he or she uses force other than deadly force may use force other than deadly force against another individual anywhere he or she has a legal right to be with no duty to retreat if he or she honestly and reasonably believes that the use of that force is necessary to defend himself or herself or another individual from the imminent unlawful force by another individual.

M.C.L. § 780.92(2).  Individuals who use such non-deadly force, in compliance with § 780.92(2), are immunized from criminal prosecution.  *See* M.C.L.  § 780.961(1).  Thus, construed in the light most favorable to Ms. Cervantes, the facts show that Ms. Cervantes defended herself from assault by Officers Torbett and Philipp, and that she used non-deadly force to defend herself.  As her use of such force in self-defense is immunized from criminal prosecution, the officers *could not have had probable cause to arrest her for assaulting them*.

The Defendants also allege that probable cause existed to arrest Ms. Cervantes for hindering and obstructing their domestic violence investigation.  The relevant Michigan statute states as follows, in pertinent part:

> (1) . . . an individual who assaults, batters, wounds, *obstructs*, opposes, or

endangers a person who the individual knows or has reason to know is performing his or her duties is guilty of a felony punishable by imprisonment for not less than 2 years or a fine of not more than $2,000.00, or both.
*****
(7) As used in this section:
(a) "Obstruct" includes the use or threatened use of physical interference or force *or a knowing failure to comply with a lawful command*.

M.C.L. § 750.81d (emphasis added). Defendants argue that Ms. Cervantes' conduct established probable cause to arrest her for obstructing their investigation as follows:

> Plaintiff was aware that the Officers were there to investigate a crime. . . . Despite this knowledge, Plaintiff refused to heed the Officers' repeated orders that she "step back," provide them with identification, and explain to them how she obtained blood on the ridge of her nose and in her left nostril. In addition, Plaintiff repeatedly attempted to walk through the Officers in an attempt to leave the area, even though she had been told that she was not free to leave until their domestic violence investigation was complete.

[Def.'s Br., Doc. No. 10, p.14].

As described *supra*, *Royer* permits Ms. Cervantes to completely disregard the questions - and later instructions stemming from those questions - of the officers. Again, probable cause to believe a suspect has "obstructed" an investigation is contingent, per M.C.L. § 750.819(7)(a), upon those commands ignored having been lawful. As Officers Torbett and Philipp lacked reasonable suspicion that Ms. Cervantes had committed a crime, they had no authority under which to engaged in a *Terry* investigative detention of Ms. Cervantes - *ergo*, the orders allegedly disobeyed by Ms. Cervantes were not "lawful" for purposes of the statute. The facts, taken in the light most favorable to Ms. Cervantes, do not establish probable cause for the Defendants to have arrested Ms. Cervantes for obstructing their investigation.

Under the second prong of the qualified immunity analysis, Ms. Cervantes has also alleged Fourth Amendment "false arrest" violations which were clearly established. The Sixth

19

Circuit, in *Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999) held that "[e]ven in 1991, the law was clearly established that, absent probable cause to believe that an offence had been committed, was being committed, or was about to be committed, officers may not arrest an individual." The Defendants' arguments to the contrary are without merit.

III.  Ms. Cervantes' Assault and Battery Allegations.

In Count IV of her Complaint, Ms. Cervantes alleges that Officers Torbett and Philipp assaulted and battered her, in violation of Michigan state law. The Defendants argue that "a police officer is permitted to use substantial but necessary force to subdue a restraint [*sic*] suspect so long as the force used was objectively reasonsble," and the Officers allege that the force they used was reasonable under the circumstances. [Def.'s Br., Doc. No. 10, p.19]. In the alternative, the officers argue that they are entitled to governmental immunity, under *Odom v. Wayne County*, 482 Mich. 459 (2008), for intentional torts committed during the performance of their discretionary duties and while acting in good faith. The Court disagrees.

To recover civil damages for battery, a wilful and harmful or offensive touching of another person resulting from an act intended to cause such contact must be shown. *See Espinoza v. Thomas*, 189 Mich.App. 110, 119 (1991). When making a *lawful* arrest, officers have the right to use that force necessary under the circumstances to effect the arrest. *Tope v. Howe*, 179 Mich.App. 91, 106 (1989). "[T]he measure of necessary force is that which an ordinarily prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would have deemed necessary." *Brewer v. Perrin*, 132 Mich.App. 520, 528 (1984).

As explained *supra*, however, the facts - construed in the light most favorable to Ms. Cervantes - demonstrate that the officers' arrest of Ms. Cervantes *was without probable cause*,

and therefore *not lawful*.  Therefore, the officers were not entitled to use *any* force on Ms. Cervantes - regardless of whether that force was of a "necessary" amount to effectuate her arrest.

Even *if* the officers had been justified in arresting Ms. Cervantes, however, summary judgment in favor of the officers would still be improper.  The facts, taken in the light most favorable to Ms. Cervantes, demonstrate genuine issues of material fact regarding whether the *amount of force* used in arresting Ms. Cervantes was reasonable.  Again, the facts show that pepper spray was not used on Ms. Cervantes - a 5'2", 135-pound female - until after she had already been wrestled to the ground and held prone by two adult male officers, each of which were at least seven inches taller than she was, and each of which outweighed Ms. Cervantes by at least fifty-eight pounds.  A reasonable jury could find, on these facts, that using pepper spray to subdue Ms. Cervantes constituted a battery.

Nor, on these facts, are the Defendants entitled to the benefit of governmental immunity under Michigan law.  Under *Odom*, to be entitled to immunity the officers must establish: (1) that the acts were undertaken during the course of employment and the employee was acting, or reasonably believed that they were acting, within the scope of their authority; (2) that the acts were undertaken in good faith, or were not undertaken with malice; and (3) that the acts were discretionary, as opposed to ministerial.  *Odom*, 482 Mich. at 481-82.

Regarding the first, "scope of employment," prong, the Michigan Supreme Court has expressly held that *ultra vires* activities engaged in by a government actor - the arrest of a suspect without probable cause, for example - are not entitled to governmental immunity.  *Ross v. Consumers Power Co.*, 420 Mich. 567, 635 (1984); see also *Lowery v. Dep't of Corrections*,

146 Mich.App. 342, 380 (1985) (holding that assaults committed by corrections officers could not be viewed as coming within the scope of their authority). Further, as Ms. Cervantes argues, "question[s] of fact exist as to whether Defendants were acting in good faith or were acting maliciously. Calling her a tramp, spraying her without warning, and waiting 23 minutes to call for decontamination do not create an inference of good faith. . . ." [Pl.'s Br., Doc. No. 14, pp.19-20]. Defendants' arguments to the contrary are without merit.

## CONCLUSION

For the reasons explained *supra*, the Court **DENIES** the Defendants' motion for summary judgment [Doc. No. 10].

**IT IS SO ORDERED**.


S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: March 1, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 1, 2010, by electronic and/or ordinary mail.

S/Jennifer Hernandez
Case Manager